**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CRIMINAL CASE NO. 1:22-cr-00016-MR-WCM**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **O R D E R** |
| | ) | |
| | ) | |
| **SHAWN THOMAS JOHNSON,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on the Government's Motion for Money Judgment [Doc. 22] and on the parties' multiple briefs addressing the issue of forfeiture [Docs. 29, 32, 35, 36, 38, 39, 40, 49, 50, 53, 54].

## I.    BACKGROUND

On March 11, 2022, the Defendant Shawn Thomas Johnson was charged in a one-count Bill of Information with bank fraud, in violation of 18 U.S.C. § 1344.   [Doc. 1].   The Bill of Information provides a Notice of Forfeiture, which states in its entirety as follows:

> Notice is hereby given of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c).  Under Section 2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. §

1956(c)(7), which are incorporated as to proceeds by Section 981(a)(1)(C). The following property is subject to forfeiture in accordance with Section 982 and/or 2461(c):

> a. All property which constitutes or is derived from proceeds of the violations set forth in this bill of information; and

> b. If, as set forth in 21 U.S.C. § 853(p), any property described in (a) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a).

> The following property is subject to forfeiture on one or more of the grounds stated above: **a forfeiture money judgment in an amount to be determined prior to sentencing, such amount constituting the net proceeds of the violations set forth in this bill of information.**

[Id. at 6] (emphasis added).

On March 25, 2022, the Defendant pled guilty to Count One of the Bill of Information pursuant to a written Plea Agreement. [Doc. 3]. In the Plea Agreement, the parties agreed to jointly recommend to the Court, for the purposes of calculating the applicable Guidelines range, that the amount of

2

loss that was known or reasonably foreseeable by the Defendant was in excess of $1.5 million but less than $3.5 million. [Id. at ¶ 7.a.]. With respect to forfeiture, the Defendant agreed, *inter alia*, to the "entry of a money judgment in the amount specified in the charging document." [Id. at ¶ 8.b.]. As noted above, however, no such amount was specified in the Bill of Information.

According to the Factual Basis submitted in support of the Plea Agreement, beginning in 2012, the Defendant and other individuals acting at his direction fraudulently obtained millions of dollars in loans to purchase properties that the Defendant effectively owned, managed, and rented through various nominees and companies. [See Doc. 4: Factual Basis at ¶ 4]. Through this scheme, the Defendant "and his co-conspirators closed on at least sixteen loans from financial institutions, totaling over $3.5 million, to purchase real estate." [Id. at ¶ 6]. Once these properties were acquired, the Defendant used them to generate income as short-term rentals. [Id.].

Neither the Bill of Information nor the Factual Basis identifies the particular sixteen loans at issue. Rather, in order to illustrate the conspiracy's scheme, the Bill of Information and the Factual Basis describe the purchase of three specific properties as follows:

3

## Example #1: 23 Springwood Drive,
## Asheville, North Carolina 28806

For example, on or about September 7, 2012, JOHNSON obtained a loan from the State Employees Credit Union, a financial institution as defined by Title 18, United States Code, Section 20, for $225,000 to purchase a home located at 23 Springwood Drive, Asheville, North Carolina. The State Employees Credit Union was an NCUA-insured financial institution.

JOHNSON signed a loan application on August 3, 2012, in which he claimed that he worked as the IT Director for Wild Flower Mountain, LLC, and that he earned a monthly income of $6,736.98 from that employment. However, JOHNSON was never an employee of Wild Flower Mountain, LLC. JOHNSON also provided two fraudulent payment statements purporting to be from Wild Flower Mountain, LLC to support his false claim of employment. Wild Flower Mountain, LLC was owned and operated by the parents of JOHNSON's then-girlfriend. JOHNSON used computer software to fabricate fraudulent income statements for himself from Wild Flower Mountain, LLC. The State Employees Credit Union relied upon these material misrepresentations when issuing the loan.

## Example #2: 31 Daniel Brooke Drive,
## Asheville, North Carolina 28806

JOHNSON and a co-conspirator, "T.F.," sought to purchase a house at 31 Daniel Brooke Drive, Asheville, North Carolina, to use as a short-term rental. JOHNSON and T.F. agreed to split proceeds from the rental of the property. The Federal National Mortgage Association (otherwise known as "Fannie Mae") owned the home due to foreclosure from the previous occupant, and T.F. purchased the home at auction with JOHNSON acting as the buyer's real estate agent.

T.F. was a veteran of the United States Navy, and as such was able to qualify for a VA-backed loan with more favorable terms

4

than were typically available for conventional mortgage loans. However, VA-backed loans could not be used to purchase rental properties—they were only available to purchase a primary residence.

In January 2016, at JOHNSON's request, T.F. applied for a VA-backed loan to purchase the property through Plum Dog Financial, LLC, a mortgage lending business registered in the State of North Carolina (and a "financial institution" as defined by Title 18, United States Code, Sections 20 and 27). On multiple documents in the application package, T.F. certified that the property would be used as a primary residence, even though JOHNSON and T.F. secretly had agreed to immediately use the property as a short-term rental. T.F. never intended to occupy the property. T.F. also falsely certified that the loan was not sought on behalf of an investor purchaser.

T.F. also falsely claimed to reside at 26 Uncle Drive, Asheville, NC 28806. JOHNSON owned the property at that address, and T.F. never rented nor resided at that address.

Relying on these false statements, Plum Dog Financial, LLC approved the VA-backed loan (which was funded by Platinum Mortgage, Inc., a "financial institution" as defined by Title 18, United States Code, Sections 20 and 27) for $265,000 to purchase the home at 31 Daniel Brooke Drive from Fannie Mae. T.F. signed closing documents on or about February 26, 2016.

Approximately six months after closing, JOHNSON and T.F. began listing the property at 31 Daniel Brooke Drive as a short-term rental on Airbnb. T.F. never resided in the home.

### Example #3: 64 Pine Cone Drive, Asheville, North Carolina 28805

JOHNSON and co-conspirator "N.P." sought to purchase a home located at 64 Pine Cone Drive, Asheville, North Carolina, to use as a short-term rental. JOHNSON and N.P. agreed that N.P. would purchase the property. JOHNSON acted as N.P.'s real

estate agent and directed N.P. to an FHA-insured loan to purchase the property. N.P. and JOHNSON agreed that JOHNSON would manage the short-term rental of the property.

On or about October 20, 2016, N.P. submitted a loan application package to Federal Savings Bank, a financial institution as defined by Title 18, United States Code, Section 20. N.P. also submitted the loan package to the U.S. Department of Housing and Urban Development, Federal Housing Administration, for mortgage insurance. At JOHNSON's direction, N.P. falsely declared on several different forms that he intended to use the property as a primary residence, even though JOHNSON and N.P. secretly had agreed to use the property immediately as a short-term rental. N.P. never intended to reside at the property.

Relying on these material misrepresentations of fact, Federal Saving Bank approved a loan for approximately $247,435 for N.P. to purchase the property located at 64 Pine Cone Drive, Asheville. The loan was endorsed and insured by the Federal Housing Administration. N.P. closed the loan on or about November 23, 2016.

N.P. never took residence in the home, and JOHNSON immediately began to rent the home as a short-term vacation rental.

[Doc. 1: Bill of Information at ¶¶ 8-19;Doc. 4: Factual Basis at ¶¶ 8-19].

Following the Defendant's guilty plea, the Court's probation office prepared a draft Presentence Report ("draft PSR"). [Doc. 17]. The Government filed Objections to the draft PSR. [Doc. 18]. The final version of the PSR was filed with the Court on June 7, 2022. [Doc. 19].

On July 19, 2022, the Government filed its Motion for Money Judgment, seeking the entry of a forfeiture money judgment in the amount

of $3,500,000. [Doc. 22]. The Defendant sought a number of extensions of time to respond to the Government's Motion so that the parties could attempt to resolve the forfeiture issue without a hearing. [See Docs. 23, 24, 26, 28]. Finally, on September 8, 2022, the Defendant filed a Response, asking the Court to defer disposition of the Government's Motion until the sentencing hearing. [Doc. 29]. The Government filed a Reply on September 20, 2022. [Doc. 32]. In an Order entered September 26, 2022, the Court declined to defer ruling on the issue of forfeiture and directed the Defendant to file a substantive response to the Government's Motion. [Doc. 33]. On October 12, 2022, the Defendant filed his Response. [Doc. 35]. The Government filed a Reply to this Response on October 20, 2022. [Doc. 36].

The Court scheduled a hearing on the Government's forfeiture motion to take place on November 17, 2022. Five days prior to that hearing, the Government filed a "Memorandum in Support of Asset Forfeiture," in which the Government identified—for the first time—the sixteen loans referenced in the Bill of Information as follows:

7

| # | Property Address | Closing Date | Lender[1] | Loan Type | Loan Amount |
|---|---|---|---|---|---|
| 1 | 23 Springwood | 9/7/2012 | SECU | 1st Refinance | $225,000 |
| 2 | 31 Daniel Brooke | 2/26/2016 | Platinum Mortgage | Original | $265,000 |
| 3 | 652 Sand Hill | 5/10/2016 | ASB | Original | $131,930 |
| 4 | 648 Sand Hill | 7/22/2106 | ASB | Original | $135,200 |
| 5 | 64 Pine Cone | 11/23/2106 | FSB | Original | $247,435 |
| 6 | 446 N Louisiana | 12/15/2016 | SECU | Original | $150,000 |
| 7 | 16 Upstream | 5/16/2017 | FNBP | Original | $356,250 |
| 8 | 22 Edwards | 7/25/2017 | CCU | Original | $167,000 |
| 9 | 70 Knollview | 12/14/2017 | FSB | Original | $285,000 |
| 10 | 24 Apogee | 6/25/2019 | Sprout | 2nd Refinance[2] | $151,200 |
| 11 | 648 Sand Hill | 7/29/2019 | Sprout | 2nd Refinance | $196,000 |
| 12 | 23 Springwood | 7/31/2019 | Sprout | 2nd Refinance | $205,000 |
| 13 | 31 Daniel Brooke | 8/2/2019 | Sprout | 1st Refinance | $258,750 |
| 14 | 446 N Louisiana | 8/2/2019 | Sprout | 1st Refinance | $153,000 |
| 15 | 26 Uncle | 10/29/2019 | Sprout | 1st Refinance | $496,000 |
| 16 | 561 Emma | 11/4/2019 | Sprout | Original | $162,400 |

**Total Fraudulent Loans from Bill of Information $3,585,166**

---

[1] "SECU" is a reference to State Employees Credit Union; "ASB" is a reference to Asheville Savings Bank (later First Bank); "FSB" is a reference to Federal Savings Bank; "FNBP" is a reference to First National Bank of Pennsylvania; "CCU" is a reference to Champion Credit Union; and "Sprout" is a reference to Recovco Mortgage Management, d/b/a Sprout Mortgage.

[2] Although the Government lists this loan as "Original" in its Table 1 [Doc. 38 at 2 T.1], in a subsequent Table in the same Memorandum, the Government indicates that this loan is, in fact, a second refinancing [see id. at 8 T.3].

8

The Government asserted that these sixteen loans were "a combination of initial loans to purchase properties and refinance loans for properties the Defendant already controlled." [Doc. 38 at 2]. The Government also identified, for the first time, three "metaphorical buckets" of assets that, the Government contends, are subject to forfeiture: (1) money that the Defendant received from the banks for the fraudulent loans (both to acquire real property and to refinance other loans); (2) money that the Defendant derived from rents from those properties; and (3) the profits that the Defendant earned from the appreciated value of the "dirty" properties that he sold. [Id. at 4]. While arguing that the identifiable proceeds derived from the Defendant's fraud greatly exceeds $3.5 million, the Government contends that the entry of a forfeiture money judgment in that amount "reflects the amount of fraud that the Defendant admitted to in his Plea Agreement and the Factual Basis" and therefore would be "[t]he simplest and most straightforward resolution" of the forfeiture issue. [Id. at 7, 13].

On November 16, 2022, the Government filed another supplemental memorandum in support of its motion for forfeiture, asking the Court to take judicial notice of a Gatekeeper Order and Preliminary Injunction issued against the Defendant by the Buncombe County Superior Court. [Doc. 39].

That same day, the Defendant filed a "Memorandum in Opposition to Asset Forfeiture." [Doc. 40]. In this Memorandum, the Defendant argues, *inter alia*, that (1) any of the loans issued by Sprout Mortgage cannot be used as a basis for forfeiture and (2) pursuant to 18 U.S.C. § 981(a)(2)(B), the Defendant is entitled to deduct the direct costs incurred in running his short-term vacation rental business from any forfeited amounts of rental income and appreciation. [Id. at 1-3].

The Court held a hearing on the Government's forfeiture motion on November 17, 2022. At the hearing, the Court asked the parties to submit supplemental briefs on the following issues: (1) whether the language of the Forfeiture Notice in the Bill of Information limits the scope of the forfeiture and (2) whether the forfeiture of rental income from fraudulently obtained property should be offset by business expenses. The parties submitted their supplemental briefs addressing these issues on December 12, 2022. [Doc. 49, 50]. The parties filed responsive briefs on December 19, 2022. [Docs. 53, 54]. Having been exhaustively briefed, this matter is ripe for disposition.

## II.  STANDARD OF REVIEW

Pursuant to 18 U.S.C. § 982(a)(2), any person convicted of bank fraud in violation of 18 U.S.C. § 1344 shall forfeit to the United States "any property constituting, or derived from, proceeds the person obtained directly or

indirectly, as the result of such violation." 18 U.S.C. § 982(a)(2). A judgment of forfeiture under § 982 "is not a separate conviction; rather, it constitutes part of the sentence, in that it is utilized to enhance the punishment of a defendant who has already been convicted of a particular offense." United States v. Cherry, 330 F.3d 658, 669 (4th Cir. 2003). The primary remedial purposes of criminal forfeiture are to punish the defendant and to disgorge him of his ill-gotten gains. United States v. Bailey, 926 F. Supp. 2d 739, 764 (W.D.N.C. 2013).

The Government has the burden of proving forfeiture by a preponderance of the evidence. Cherry, 330 F.3d at 670. Where the Government seeks forfeiture of specific property, the Government must establish "the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). Where the Government seeks a personal money judgment, the Court "must determine the amount of money that the defendant will be ordered to pay." Id. The Court's determination regarding forfeiture "may be based on evidence already in the record, including any written plea agreement, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B).

## III.   DISCUSSION

### A.   Forfeiture Notice

A judgment of forfeiture in a criminal proceeding may not be entered unless the charging document contains a notice to the defendant that the government intends to seek the forfeiture of property as part of the defendant's sentence.   Fed. R. Crim. P. 32.2(a).   Such notice "need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks."   Id.   The purpose of the notice of forfeiture "is to inform the defendant that the government seeks forfeiture as a remedy.   Barebones pleading suffices so long as it puts the defendant on notice that the government seeks forfeiture and identifies the assets subject to forfeiture with sufficient specificity to permit the defendant to marshal evidence in their defense."   United States v. Cauble, 706 F.2d 1322, 1347 (5th Cir. 1983) (footnote omitted).

Here, the notice of forfeiture contained within the Bill of Information gave notice to the Defendant that the Government intended to seek forfeiture pursuant to 18 U.S.C. § 982 and 28 U.S.C. § 2461(c).   [Doc. 1: Bill of Information at 6].   It also identified the assets subject to forfeiture as follows: "a forfeiture money judgment in an amount to be determined prior to sentencing, *such amount constituting the net proceeds of the violations* set

12

forth in this bill of information." [Id.] (emphasis added). The Government contends that this notice was sufficient to advise the Defendant that the Government intended to seek forfeiture of *at least* the net proceeds as part of "all property which constitutes or is derived from the proceeds of the violations" pursuant to § 982(a)(2). [Doc. 49 at 3]. In support of this argument, the Government cites a number of out-of-circuit cases in which courts imposed forfeiture amounts in excess of what was charged in the indictment. Unlike many of those cited cases, however, the Government in the present case limited its description of the assets to be forfeited by not including a phrase such as "including but not limited to" or "at least." See, e.g., United States v. Segal, 495 F.3d 826, 838-39 (7th Cir. 2007) (noting that indictment that used term "at least" to describe money judgment amount did not limit higher forfeiture at trial); United States v. Peters, 257 F.R.D. 377, 383 (W.D.N.Y. 2009) (finding sufficient for purposes of Rule 32.2 the Government's use of notice of the property subject to forfeiture as "including but not limited to" specified money judgments and "any other proceeds generated from the offense[s] of conviction," along with any substitute assets "up to the value of" the requested money judgments), aff'd, 732 F.3d 93 (2d Cir. 2013); United States v. Marcello, No. 02 CR 1050-2, 2009 WL 931039, at *1 (N.D. Ill. Apr. 6, 2009) (finding that, by virtue of language defining

13

forfeiture under § 1962 and by virtue of "includ[ing] but . . . not limited to" language that preceded specific $10,000,000 amount listed in indictment, the defendant was notified of forfeiture greater than $10,000,000).

The Government is correct that Rule 32.2 does not require specific notice of the amount sought in a forfeiture money judgment. In this case, however, the Government did not craft a barebones notice; it *chose* to limit itself by seeking a forfeiture money judgment consisting of only "the net proceeds" of the Defendant's crime. See United States v. Pantelidis, No. CRIM. 01-0694, 2005 WL 1320135, at *2 (E.D. Pa. June 1, 2005) ("While the government is correct that it could have chosen to seek forfeiture of more funds than it did, the fact remains that the government is stuck with the number it chose in the indictment."). The forfeiture money judgment, therefore, will be limited to the net proceeds of the Defendant's bank fraud offense.

## B. Loan Proceeds

The Defendant here has agreed as part of his plea agreement to the entry of a forfeiture money judgment.[3] The Government seeks a forfeiture

---

[3] While the Defendant agreed to the entry of a forfeiture money judgment, no specific amount of such judgment was specified either in the Bill of Information or in the Defendant's Plea Agreement.

money judgment in the amount of $3.5 million.  The Government contends that such judgment would be "essentially a placeholder as to the maximum amount of substitute property that the Government may forfeit from [the] Defendant who has otherwise rendered forfeitable property out of reach." [Doc. 22 at 4 n.1].

"The purpose of a forfeiture money judgment is to impose liability in the amount of the proceeds." United States v. Jameel, No. 2:13CR98, 2014 WL 5317860, at *2 (E.D. Va. Oct. 16, 2014), aff'd, 626 F. App'x 415 (4th Cir. 2015).  In determining whether a forfeiture money judgment is appropriate, the Court must determine whether the proceeds of the crime are available to the Government to seize.  See United States v. Blackman, 746 F.3d 137, 145 (4th Cir. 2014) (noting that forfeiture money judgment are "especially appropriate where physical assets derived from the [offense] are no longer traceable or available").

The Government argues that a forfeiture money judgment is appropriate here because the properties that were obtained through the Defendant's fraud are no longer available for various reasons.  First, the Government argues that some of the forfeitable properties are not available for forfeiture because they were "purchased in nominee names."  [Doc. 22 at 4 n.2].  This is presumably a reference to certain loan transactions, such as

15

Examples #2 and #3 in the Factual Basis, wherein a co-conspirator of the Defendant submitted a false loan application and purchased real property with the intent to use that property as a short-term rental. These properties, however, are not subject to forfeiture *by the Defendant*. In each of these transactions, the Defendant acted as the buyer's real estate agent and managed the properties as short-term rentals. [See id. at ¶¶ 10, 15, 16, 19]. While the Defendant directed his co-conspirators to submit false loan applications [Id. at ¶¶ 12, 17], he did not himself apply for the loans or receive the proceeds. Under § 982(a)(2), criminal forfeiture is limited to "property constituting, or derived from, any proceeds *the person obtained*, directly or indirectly, as the result of" the offense. 18 U.S.C. § 982(a)(2) (emphasis added). To "obtain" property, a person must have personally acquired it; one does not obtain property "acquired by someone else." Honeycutt v. United States, 137 S. Ct. 1626, 1632 (2017) (discussing criminal forfeiture under 21 U.S.C. § 853(a)(1)); see also United States v. Chittenden, 896 F.3d 633, 637 (4th Cir. 2018) (applying Honeycutt to § 982(a)(2) and concluding that § 982(a)(2) permits forfeiture "only of tainted property the defendant personally acquired").

While recognizing that a defendant can be ordered to forfeit only such tainted property that he himself actually obtained, the Government contends

16

that the Defendant "controlled the conspiracy", as well as the "entities that acquired real estate with the proceeds." [Doc. 22 at 5-6]. The record, however, does not support this contention. While the Defendant may have directed his co-conspirators to submit false loans applications, the proceeds from such loans flowed to those co-conspirators, and the properties purchased with those proceeds were titled in the names of those co-conspirators. For those transactions, the Defendant acted as a real estate agent and subsequently as a property manager for the short-term rentals of those properties. Nothing has been presented by the Government to demonstrate that the loan proceeds were acquired, directly or indirectly, by the Defendant.[4]

Because the Defendant himself did not personally acquire these referenced properties, the loans proceeds obtained by the Defendant's co-

---

[4] The Government repeatedly makes references in its briefs to the Defendant having stipulated that he received the initial $3.5 million in loan proceeds and used those proceeds to purchase real estate. [See, e.g., Doc. 32 at 1 ("Defendant stipulated that he obtained proceeds from the initial lenders"); Doc. 36 at 5 ("Defendant has stipulated that he received the initial $3.5 million in loans and used the loans to purchase real estate")]. However, a careful reading of the Factual Basis reveals that the Defendant did not enter any such stipulation. The Defendant stipulated that the Government has sufficient evidence to prove that he and his co-conspirators closed on at least sixteen loans from financial institutions, totaling over $3.5 million, to purchase real estate." [Doc. 4: Factual Basis at ¶ 6] (emphasis). At no point in the Factual Basis does the Defendant stipulate that he received *all* of the initial loan proceeds.

17

conspirators and the properties subsequently purchased with such proceeds are not forfeitable properties vis-à-vis the Defendant. Accordingly, to the extent that the Government seeks a forfeiture money judgment regarding the net proceeds from those properties purchased by the Defendant's co-conspirators, the motion for a money judgment is denied.

The Government contends that the Defendant personally acquired[5] $2,885,730 in proceeds from his fraudulent loan applications. [Doc. 38 at 8 T.3].[6] The Government further contends that these properties are no longer available because they have been "refinanced" or were "placed in complex judicial proceedings tied to foreclosure and bankruptcy." [Doc. 22 at 4 n.2]. The Fourth Circuit has recognized that real property is "unavailable" for the purpose of forfeiture when such properties have been pledged as collateral for loans. See, e.g., Jameel, 626 F. App'x at 419 (noting that government had right to request forfeiture money judgment when defendant executed promissory notes and deeds of trust on real property, thereby "drowning [the defendant's rights to the proceeds] in negative equity"). The Court therefore

_____

[5] The Government omitted loans obtained from lenders that may not qualify as "financial institutions" by statute. See 18 U.S.C. § 20. Also omitted from this table are loans that were obtained by the Defendant's co-conspirators, and such co-conspirators retained custody and control of the properties.

[6] While the Government claims that the total amount of these fraudulent loans comes to $2,885,730, it appears that the total of these loans is actually $2,885,530.

18

agrees with the Government that properties that have been refinanced or subject to bankruptcy or foreclosure proceedings have been rendered effectively unavailable for the purpose of forfeiture.

The Defendant argues that any loans originating from Recovco d/b/a Sprout Mortgage (hereinafter "Sprout") should not be included in this total because Sprout was not identified in either the Bill of Information or the Factual Basis as a financial institution affected by the Defendant's fraud.

While the Defendant is correct that the Bill of Information and Factual Basis do not identify Sprout as a victim lender in this case, this omission does not remove Sprout from the forfeiture calculation. The Defendant pled guilty to fraud affecting a financial institution, involving at least sixteen separate loan applications. Now, at the forfeiture stage, the Government has the burden of proving by a preponderance of the evidence that the Defendant obtained certain proceeds from financial institutions, including Sprout, "as the result of such violation." 18 U.S.C. § 982(a)(2). The failure to explicitly reference this particular financial institution in the charging document or the factual basis is not fatal to the Government's motion for forfeiture.

The Defendant further argues that he is entitled to offset the forfeiture amount by any of the loans that have been repaid. In a criminal proceeding, a forfeiture money judgment generally is "calculated on the basis of the total

19

proceeds of a crime, not the percentage of those proceeds remaining in the defendant's possession at the time of the sentencing hearing." Blackman, 746 F.3d at 144. Here, however, the Government has taken the unusual step of limiting its right to forfeiture to only the "net proceeds" of the Defendant's offense. The Court, therefore, concludes that the Government is entitled to seek forfeiture in the amount of those loans personally obtained by the Defendant, offset by the amount of loans which have been repaid.[7] The Court therefore will order a forfeiture money judgment at least in the amount of $1,126,150 for the loan proceeds obtained from the following (as yet unpaid)[8] loans:

| # | Property | Unpaid Loan |
|---|----------|-------------|
| 1 | 23 Springwood | Sprout 8/1/19 $205,000 |
| 2 | 648 Sand Hill | Sprout 7/30/19 $196,000 |

---

[7] Because the Court has concluded that the Government is limited by its own wording of the Notice of Forfeiture to the Defendant's net proceeds, the Court need not address the Defendant's argument that he is entitled to an offset pursuant to 18 U.S.C. § 981(a)(2)(C).

[8] As discussed in the section on Appreciation from Sale of Properties, *infra*, the Defendant purchased three other properties with fraudulently obtained loans and subsequently sold those properties for a profit. Even though the record is not clear whether the fraudulently obtained loans were paid off at the time of sale, it stands to reason that such was required by both lender and buyer, and the Court so finds. Therefore, the Court does not include those properties in its calculation of fraudulently obtained loan proceeds here.

| 3 | 24 Apogee | Sprout<br>6/25/19<br>$151,000 |
| 4 | 446 N. Louisiana | Sprout<br>8/2/19<br>$153,000 |
| 5 | 31 Daniel Brooke | Sprout<br>8/2/19<br>$258,750 |
| 6 | 561 Emma | Sprout<br>11/4/19<br>$162,400 |

## C.    Rental Income

The Government contends that the Defendant derived at least $1.58 million in rental income from the properties he financed via fraudulent loans obtained from financial institutions as demonstrated in the table below:

| # | Property | Airbnb Rents 3/17-4/20 | VRBO Rents 10/20-11/22 | Airbnb Rents 3/21-11/22 | Total |
|---|----------|------------------------|------------------------|-------------------------|-------|
| 1 | 23 Springwood | $205,408 | $6,291 | | $211,699 |
| 2 | 31 Daniel Brooke | $253,261 | $14,168 | $133,649 | $401,078 |
| 3 | 648 Sand Hill | $58,759 | $2,986 | $45,515 | $107,259 |
| 4 | 446 N. Louisiana | $130,029 | $17,744 | $105,666 | $253,439 |
| 5 | 16 Upstream | $211,921 | | | $211,921 |
| 6 | 24 Apogee | $36,747 | $9,379 | $119,877 | $166,004 |
| 7 | 26 Uncle | $48,563 | | $111,122 | $159,685 |
| 8 | 561 Emma | $13,348 | | $61,197 | $74,546 |

**Total Known Rental Income: $1,585,631[9]**

The Defendant argues that any rental income derived from these properties are not "proceeds" of his offense and are therefore not subject to

---

[9] The Government notes that this figure reflects only records from Airbnb and partial records from VRBO, but that the Defendant also listed the rentals on other online platforms.  [Doc. 38 at 11-12].

21

forfeiture. [Doc. 54 at 1-2]. The Defendant, however, is incorrect. The term "proceeds" includes any property obtained, directly or indirectly, as a result of the offense. "In the case of a business that would not have been solvent but for the infusion of illegally-obtained funds, the entire business may be subject to forfeiture as the proceeds of the offense." United States v. Park, 825 F. Supp. 2d 644, 648 (D. Md. 2011); see also United States v. Warshak, 631 F.3d 266, 332-33 (6th Cir. 2010) (finding all proceeds of defendant's business to be forfeitable because the business was "permeated with fraud" business would not have existed but for the "fraudulent beginnings" of the entire operation); United States v. Farkas, No. 1:10cr200 (LMB), 2011 WL 5101752, at *3 (E.D. Va. Oct. 26, 2011) (where defendant's business would not have been solvent but for the infusion of fraud proceeds, "proceeds" interpreted to include defendant's gross receipts even if such receipts were not directly attributable to a particular fraudulent act). Accordingly, the income received by the Defendant through the rental of his fraudulently obtained properties is subject to forfeiture.

Nonetheless, the Defendant correctly argues that, because the Government is seeking only "net proceeds," he is entitled to deduct the direct costs incurred in his running his rental business. [Doc. 50 at 2]. In support of this contention, the Defendant submits unsworn statements of "profit and

22

loss" for the periods of March 2017 through April 2020 and October 2020 through November 2022. [Docs. 50-1, 50-2]. According to these statements, the Defendant had a gross income of $1,241,315.79 and a net income of $361,542.85 for the period of March 2017 through April 2020, and a gross income of $2,821,667.84 and a net income of $158,266.82 for the period of October 2020 through November 2022. The Defendant, however, offers no supporting documentation or any meaningful explanation for these figures. Further, these statements do not appear to address rentals via VRBO, another platform frequently used by the Defendant, thereby undercutting the Defendant's claimed gross and net proceeds. The Defendant's claimed expenses, moreover, appear vastly exaggerated for these periods. Accordingly, the Court does not find these Profit and Loss Statements to be an accurate measure of the Defendant's income or expenses during the relevant period.[10] Given the paucity of evidence as to the amount of the Defendant's actual expenses related to the rentals, taken with the inescapable truth that operating rental units entails expenses, the Court is

---

[10] It is noted that the Defendant's gross income figure for these periods of $4,062,983.63 greatly exceeds the gross *rental* figure provided by the Government of $1,585,631.00. From this the Court concludes that the Defendant's income statements provide essentially no guidance regarding the rental segment of the business or for calculating the net income solely from rental properties.

left to make its best rough estimate in order to arrive upon the Defendant's net rental proceeds. Therefore, the Court estimates that the Defendant's expenses should be approximately one third of the gross rental amount, and will employ this figure to find that a reasonable estimate of the Defendant's net rental proceeds to be $1,057,087.00

For all of these reasons, the Court concludes that the rental income realized by the Defendant is subject to forfeiture.

### D. Appreciation from the Sale of Properties

The third category of proceeds that the Government seeks to include in the forfeiture money judgment consists of the appreciation of three properties obtained with fraudulent loans which were then sold.[11] The Government's evidence reflects that the Defendant purchased 652 Sand Hill on May 10, 2016 for $176,000 and sold it on October 26, 2018 for $186,000, resulting in an appreciation of $10,000. The Defendant purchased 16 Upstream on May 16, 2017 for $375,000 and sold it on August 18, 2020 for $440,000, resulting in an appreciation of $65,000. Finally, the Defendant purchased 26 Uncle on May 31, 2019 for $400,000; he refinanced the

---

[11] In accord with Note 8, supra, the Court finds that, upon the sale of these properties, the fraudulently obtained loans were then repaid. The Government has not offered any evidence to indicate that these loans are still outstanding, and thus, these properties were not included in the calculation of the "Loan Proceeds" *supra.*

24

original loan with Sprout on October 29, 2019 for $496,000. He then sold 26 Uncle on March 9, 2022 for $920,000; thereby gaining an appreciation in the value of that property of $520,000. Accordingly, the Court concludes that the $595,000 that the Defendant realized in the appreciation of properties that he obtained with fraudulent loans and subsequently sold is also subject to forfeiture.

For all of these reasons, the Court will enter a forfeiture money judgment in the following amount:

| | |
|---|---|
| Loan Proceeds | $1,126,150 |
| Rental Income | 1,057,087 |
| Appreciation from Sales | 595,000 |
| **TOTAL** | **$2,778,237**[12] |

---

[12] Because the Court declines to enter a forfeiture money judgment in the full amount requested by the Government, the Court need not address the Defendant's argument that a $3.5 million forfeiture money judgment would violate the Excessive Fines Clause. Assuming that the Defendant would make such an argument with respect to the amount of the forfeiture money judgment entered today, the Court concludes that such amount is not grossly disproportional to the Defendant's offense. Accordingly, the Defendant's excessive fines argument is rejected.

## O R D E R

**IT IS, THEREFORE, ORDERED** that on the Government's Motion for
Money Judgment [Doc. 22] is **GRANTED** to the extent that this Order shall
constitute a forfeiture Money Judgment against the Defendant in the amount
of $2,778,237, constituting the net proceeds of the Defendant's fraud as set
forth in Count One of the Bill of Information.

**IT IS SO ORDERED.**

Signed: April 26, 2023

Martin Reidinger
Chief United States District Judge